**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 1 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

CHET A. HURD,

    Plaintiff-Appellant,

v.

PITTSBURG STATE UNIVERSITY,

    Defendant-Appellee.
============================

UNITED STATES OF AMERICA,

    Intervenor.

No. 95-3236

---

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 92-CV-2253)

---

Mark A. Buchanan, The Popham Law Firm, P.C., Kansas City, Missouri, for Plaintiff-Appellant.

Kevin D. Case, Assistant Attorney General, Topeka, Kansas, for Defendant-Appellee.

Jessica Dunsay Silver and Seth M. Galanter, Attorneys, Department of Justice, Washington, D.C., filed a brief for Intervenor.

Before **SEYMOUR**, Chief Judge, **PORFILIO**, and **LUCERO**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

Plaintiff Chet A. Hurd appeals from a jury verdict in favor of defendant Pittsburg State University on Mr. Hurd's claim of discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634.  After concluding that   Seminole Tribe of Florida v. Florida   , 116 S. Ct. 1114 (1996), does not deprive us of jurisdiction over Mr. Hurd's claim against the state, we affirm.

# I

## BACKGROUND

Mr. Hurd brought this action against Pittsburg State University (PSU), claiming he was discharged in violation of the ADEA.  PSU moved to dismiss on the basis that, as an agency of the state of Kansas, it was entitled to Eleventh Amendment immunity from suit in federal court.    [1]   The district court rejected that contention, holding that Congress abrogated state sovereign immunity by enacting the 1974 amendments to the ADEA.     Hurd v. Pittsburg State Univ.   , 821 F. Supp.

---

[1]The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

1410 (D. Kan. 1993) ( <u>Hurd I</u>).  We affirmed on an interlocutory appeal.  <u>Hurd v. Pittsburg State Univ.</u>, 29 F.3d 564 (10th Cir. 1994) ( <u>Hurd II</u>), <u>cert. denied</u>, 115 S. Ct. 321 (1994).

After a jury verdict for PSU, Mr. Hurd moved for a new trial arguing the district court had erred in overruling his <u>Batson</u> challenge to PSU's peremptory strike of the sole African-American juror.  The district court denied the motion, <u>Hurd v. Pittsburg State Univ.</u>, 892 F. Supp. 245 (D. Kan. 1995) ( <u>Hurd III</u>), and Mr. Hurd appeals this single issue.  While this appeal was pending, the Supreme Court held in <u>Seminole Tribe</u> that the Interstate Commerce Clause does not provide authority for Congress to abrogate a state's immunity from suit under the Eleventh Amendment.  PSU asserted during oral argument on Mr. Hurd's appeal that the decision in <u>Seminole Tribe</u> substantially altered the landscape of Eleventh Amendment jurisprudence, requiring us to reconsider our decision in <u>Hurd II</u> on PSU's Eleventh Amendment immunity claim.  We asked the parties to file supplemental briefs on this latter issue.  The United States exercised its right under 28 U.S.C. § 2403(a) to intervene to defend the constitutionality of the ADEA as it applies to the states.

## II

## ELEVENTH AMENDMENT

We first address PSU's claim that our Eleventh Amendment immunity determination in Hurd II was overruled by Seminole Tribe . In the case of an intervening Supreme Court ruling, a single panel is permitted to reconsider a previous Tenth Circuit decision to the extent the new case law invalidates our previous analysis. Berry v. Stevinson Chevrolet , 74 F.3d 980, 985 (10th Cir. 1996) ("Absent an intervening Supreme Court or en banc decision justifying such action, we lack the power to overrule" a previous decision.); United States v. Platero , 72 F.3d 806, 811 (10th Cir. 1995) ("[A]n intervening change in the law may serve as a cogent reason for relaxing the doctrine of the law of the case . . . ."). Because Seminole Tribe did indeed change Eleventh Amendment law, it is appropriate for us to review its impact on our previous ruling.

In Seminole Tribe , the Court considered whether Congress could abrogate state sovereign immunity by enacting the Indian Gaming REGULATORY Act of 1988 pursuant to the Indian Commerce Clause, U.S. CONST., art. I, § 8, cl. 3. Seminole Tribe , 116 S. Ct. at 1119. To resolve that question, the Court asked: "first, whether Congress has 'unequivocally expressed its intent to abrogate . . . immunity;' and second, whether Congress has 'acted pursuant to a valid exercise

of power.'" Id. at 1123 (citations omitted). By applying standards set out in its prior opinions, the Court concluded that Congress had unquestionably *intended* to subject states to suit. Id. at 1123-24. In discussing whether Congress has the *power* to abrogate state sovereign immunity, the Court acknowledged it had previously recognized two sources of authority for abrogation, the Commerce Clause and section five of the Fourteenth Amendment. Id. at 1125. The Court then expressly overruled the Union Gas plurality's conclusion that the Interstate Commerce Clause constituted authority for abrogation of state sovereign immunity. Id. at 1128 (overruling Pennsylvania v. Union Gas Co., 491 U.S. 1 (1989)). Likening the Indian Commerce Clause to the Interstate Commerce Clause, id. at 1127, the Court held that Congress lacked authority under those provisions to authorize suits by Indian tribes against the states, id. at 1128, 1131-32. The Court left untouched case law relying on the Fourteenth Amendment as authority. Id. at 1128.

Seminole Tribe thus imposed two significant changes. First, it brought into sharp focus a two-part test that had been previously only implicitly stated. Id. at 1123 (quoting Green v. Mansour, 474 U.S. 64, 68 (1985)). Second, it invalidated the Commerce Clause as an appropriate source of authority for abrogation of state sovereign immunity. Id. at 1128. We apply those principles to this case.

In Hurd I, the district court presciently applied the two-part analysis now

required by Seminole Tribe. Hurd I, 821 F. Supp. at 1412-13. The district court concluded that the 1974 ADEA amendments were enacted pursuant to Congress' Fourteenth Amendment authority and that Congress had intended to subject states to suit. Id. We affirmed the district court and expressly concurred in its conclusion that Congress had *intended* to abrogate state sovereign immunity. Hurd II, 29 F.3d at 565. We did not specifically state we were adopting the district court's conclusion that Congress had acted pursuant to its Fourteenth Amendment authority; we said only that "we affirm[ed] for substantially the same reasons given by the district court." Id. PSU now claims in light of Seminole Tribe that the district court's reasoning, and therefore our reasoning, was flawed in several respects. We will consider each of PSU's arguments.

A. Intent to Abrogate

PSU contends the district court's analysis of Congress' intent to abrogate was flawed for two reasons: the district court looked to the legislative history of the ADEA in violation of Seminole Tribe's express prohibition of such recourse; and the ADEA's jurisdictional provisions incorporate language previously found insufficient by the Court to establish intent to abrogate. [2] PSU's concerns about

_____

[2]PSU also asserts that because the Court in Seminole Tribe performed its analysis of Congress' intent to abrogate state sovereign immunity before it analyzed Congress' power to do so, 116 S. Ct. at 1123, the district court erred

- 7 -

this part of the Seminole Tribe test are unfounded.

Seminole Tribe reaffirms that Congress' *intent* to abrogate state sovereign immunity must be "'unmistakably clear in the language of the statute.'" Seminole Tribe, 116 S. Ct. at 1123 (quoting Dellmuth v. Muth, 491 U.S. 223, 227-28 (1989)). "Legislative history generally will be irrelevant to a judicial inquiry into whether Congress intended to abrogate the Eleventh Amendment." Muth, 491 U.S. at 230 (emphasis added). The district court did not rely on legislative history in the intent-to-abrogate inquiry, Hurd I, 821 F. Supp. at 1413; it relied on legislative history only in its assessment of whether Congress had the *power* to abrogate state sovereign immunity, id. at 1412. PSU is wrong in assuming that the district court applied legislative history in the intent-to-abrogate prong of the Seminole Tribe test.

PSU further argues the district court erred in its evaluation because the ADEA shared language with a version of the Fair Labor Standards Act, a statute found not to clearly express Congress' intent to abrogate, see Employees v.

_____

when it performed the analysis in the reverse order. Aplee.'s Supp. Br. at 6. However, the "power" and "intent" inquiries are independent; we discern no necessary linkage between them beyond the fact they must both be satisfied before concluding that an act abrogates state sovereign immunity. The likely reason for the order of analysis propounded by Seminole Tribe is that the more problematic constitutional "power" inquiry need not be reached if the relatively straightforward "intent" inquiry is resolved in the negative.

Missouri Public Health Dept._, 411 U.S. 279, 285 (1973). Employees was decided long before Seminole Tribe. By raising Employees, PSU is re-arguing an issue already presented to the district court, Hurd I, 821 F. Supp. at 1413, and decided by this court, Hurd II, 29 F.3d at 565. As a single panel reviewing a Tenth Circuit decision, we are strictly concerned with new guidance provided by Seminole Tribe. We are not at liberty to revisit issues previously decided by this court and unaltered by Seminole Tribe.[3]

More importantly, Seminole Tribe does nothing to draw into question our conclusion regarding congressional intent. On the contrary, the Court there notes that "numerous references to the 'State'" as a defendant "make it indubitable that Congress intended . . . to abrogate the States' sovereign immunity from suit." Seminole Tribe, 116 S. Ct. at 1124. We have no reason to question our decision

---

[3]We do note here that the Fair Labor Standards Act enforcement provisions invalidated by Employees v. Missouri Public Health Dept., 411 U.S. 279 (1973), were specifically amended in 1974 to accommodate the concerns of the Court in Employees and now authorize suit in any federal court. 29 U.S.C. § 216(b). Thus, the enforcement provisions which the ADEA *now* references specifically authorize ADEA suits in federal court. 29 U.S.C. § 626(b). The ADEA, therefore, no longer suffers from the ambiguity which would have prevented it from passing muster under Employees.

Moreover, rather than calling into question our conclusion that Congress intended to abrogate state sovereign immunity, the rationale of Employees bolsters it. Hale v. Arizona, 993 F.2d 1387, 1391 (9th Cir. 1993) (en banc); Timmer v. Michigan Dept. of Commerce, No. 95-1706, 1997 WL 11361, at *3 (6th Cir. Jan. 15, 1997) (concluding that, by defining employers to include states under the Equal Pay Act and amending the FLSA enforcement provisions to allow suit in federal court, Congress intended to abrogate state sovereign immunity).

in Hurd II that Congress intended to abrogate state sovereign immunity by enacting the 1974 amendments to the ADEA. [4]

B. Power to Abrogate

PSU next turns its attention to the second prong of the Seminole Tribe test, Congress' power to abrogate state sovereign immunity. This is the area of analysis most significantly changed by Seminole Tribe, and we will consider it in some detail.

The district court expressly concluded that the 1974 amendments to the ADEA were enacted pursuant to Congress' power under section five of the

---

[4]We are not the only court to conclude that the ADEA, as amended in 1974, was intended to abrogate state sovereign immunity. Since the 1974 amendments to the ADEA and the FLSA, the Supreme Court and other lower courts have uniformly held that Congress expressly intended to abrogate state sovereign immunity and subject states to suit under the ADEA. Gregory v. Ashcroft, 501 U.S. 452, 467 (1991) ("The ADEA plainly covers all state employees except those excluded by one of the exceptions."); EEOC v. Wyoming, 460 U.S. 226, 233 (1983) ("In 1974, Congress extended the substantive prohibitions of the [ADEA] . . . to . . . State Governments."); Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 695 (3d Cir. 1996) ("The statute simply leaves no room to dispute whether states and state agencies are included among the class of potential defendants when sued under the ADEA for their actions as 'employers.'"); Davidson v. Board of Governors, 920 F.2d 441, 443 (7th Cir. 1990) (Congress "could not have made its desire to override the states' sovereign immunity clearer."); Ramirez v. Puerto Rico Fire Serv., 715 F.2d 694, 701 (1st Cir. 1983) ("[T]he ADEA's express authorization for the maintenance of suits against state employers comprises adequate evidence to demonstrate the congressional will that Eleventh Amendment immunity be abrogated.").

Fourteenth Amendment. Hurd I, 821 F. Supp. at 1412. We affirmed that decision on the basis of the district court's analysis and by citing two cases from our sister circuits, both of which held that the 1974 amendments were passed pursuant to Fourteenth Amendment authority. Hurd II, 29 F.3d at 565 (citing Heiar v. Crawford County, 746 F.2d 1190, 1194 (7th Cir. 1984) and Ramirez v. Puerto Rico Fire Serv., 715 F.2d 694, 700 (1st Cir. 1983)).

PSU does not dispute that Seminole Tribe left untouched Congress' power to abrogate the Eleventh Amendment by exercise of its authority under section five of the Fourteenth Amendment. Aplee.'s Supp. Br. at 15; Seminole Tribe, 116 S. Ct. at 1125; Timmer, 1997 WL 11361, at *4 (noting that, after the issuance of Seminole Tribe, "[section five] of the Fourteenth Amendment remains a provision that vests Congress with the power to abrogate Eleventh Amendment immunity"). Instead, PSU asserts that the 1974 amendments to the ADEA were enacted pursuant to the Commerce Clause not the Fourteenth Amendment. Aplee.'s Supp. Br. at 15. Because we did not specifically state in Hurd II that we were approving the district court's reliance on the Fourteenth Amendment, and because at the time of our affirmance congressional authority under either the Commerce Clause or the Fourteenth Amendment would have been sufficient to uphold the district court, PSU argues we should reconsider the issue.

Prior to Seminole Tribe, the Supreme Court upheld the general applicability

- 11 -

of the ADEA to the states by concluding that Congress had exercised its Commerce Clause power in enacting the ADEA.       EEOC v. Wyoming, 460 U.S. 226, 243 (1983) (finding the exercise of this power did not infringe the state's implied Tenth Amendment immunity).  The Court chose not to decide whether Congress in passing the 1974 ADEA amendments had also acted pursuant to its Fourteenth Amendment power.  Id. & n.18.  Nonetheless, those circuit courts which have considered the issue have uniformly concluded the 1974 amendments to the ADEA were enacted pursuant to section five of the Fourteenth Amendment. Davidson v. Board of Governors, 920 F.2d 441, 443 (7th Cir. 1990); Heiar v. Crawford County, 746 F.2d 1190, 1194 (7th Cir. 1984); EEOC v. Elrod, 674 F.2d 601, 603 (7th Cir. 1982); Ramirez v. Puerto Rico Fire Serv., 715 F.2d 694, 699-700 (1st Cir. 1983) (legislative history of act makes clear Congress' intent to enact 1974 amendments pursuant to Fourteenth Amendment authority); Arritt v. Grisell, 567 F.2d 1267, 1270-71 (4th Cir. 1977) (legislative history makes enactment pursuant to Fourteenth Amendment authority clear); Santiago v. New York State Dept. of Correctional Servs., 945 F.2d 25, 31 (2d Cir. 1991) (dicta).[5]

_____

[5]Only a few courts have concluded that the 1974 amendments to the ADEA were enacted solely pursuant to the Commerce Clause.  MacPherson v. University of Montevallo, 938 F. Supp. 785, 789 (N.D. Ala. 1996) (ADEA claim against a state university dismissed as barred by Eleventh Amendment), appeal filed, No. 96-6947, 11th Cir. 1996; Black v. Goodman, 736 F. Supp. 1042, 1045 (D. Mont. 1990) (ADEA enacted pursuant to Commerce Clause); Farkas v. New York State

(continued...)

PSU suggests that the failure of these courts to utilize the <u>Seminole Tribe</u> two-part test renders their conclusions on congressional power, and our reliance on those conclusions, inapposite. We are not persuaded. Although <u>Seminole Tribe</u> requires courts to ascertain that Congress exercised valid legislative authority, <u>Seminole Tribe</u> articulates no particular method for determining the source of that authority. <u>Timmer</u>, 1997 WL 11361, at *7 ("<u>Seminole Tribe</u> says nothing about the situation presented here where there is a question about whether Congress legislated pursuant to an unstated Constitutional provision."). The only recent guidance the Court has offered on determining which of Congress' powers it utilized in attempting to abrogate state sovereign immunity was in dicta, some five years before the issuance of <u>Seminole Tribe</u>. <u>Gregory</u>, 501 U.S. at 469-70 (denying applicability of ADEA to state judges after concluding that Congress' intent to include these employees was not clearly enough stated regardless of whether the authority to abrogate derived from the Commerce Clause or Fourteenth Amendment power). The Court stated "'we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment.'" <u>Id.</u> at 469 (quoting <u>Pennhurst State Sch. & Hosp. v.</u>

<hr>

⁵(...continued)
<u>Dept. of Health</u>, 554 F. Supp. 24, 27 (N.D. N.Y. 1982) (denying retroactive relief under the ADEA because 1974 amendments to ADEA were not enacted pursuant to Fourteenth Amendment power). Of those cases, only <u>MacPherson</u> was decided after the issuance of <u>Seminole Tribe</u>.

- 13 -

Halderman, 451 U.S. 1, 16 (1981)).  The Sixth Circuit has recently interpreted this statement in a case involving the Equal Pay Act:

> [A] court should carefully consider the propriety and effect of concluding that Congress has acted pursuant to § 5. . . . [T]he Court did not suggest that a court should never infer congressional intent to legislate pursuant to § 5 of the Fourteenth Amendment, but rather that it should first consider a number of factors before making such an inference.

Timmer, 1997 WL 11361, at *6.  The courts on which we rely for review of Congress' power to extend the ADEA to the states in no way flout the cautionary note in Gregory; each gave careful and measured consideration to Congress' source of authority in enacting the 1974 amendments.  Ramirez, 715 F.2d at 698-700; Elrod, 674 F.2d at 604-609; cf. EEOC v. Wyoming, 460 U.S. at 243 n.18 (approving the use of legislative history to determine the source of congressional authority).  We are as persuaded now by the reasoning in these cases as we no doubt were when we relied on them in Hurd II.[6]

In sum, nothing in Seminole Tribe requires us to alter our implicit conclusion in Hurd II that the legislative history of the 1974 amendments to the

---

[6]PSU also argues that Kansas could effectively deter age discrimination without the necessity of ADEA suits against it in federal court.  We do not disagree with that proposition, but it is not relevant to our determination today.  Seminole Tribe takes no note of a state's ability to provide alternative remedies or protections.  Rather, Seminole Tribe proposes a two-prong test for determining whether Congress appropriately abrogated the states' Eleventh Amendment immunity from suit, both prongs of which have been met here.

ADEA reflects a purpose consistent with the Fourteenth Amendment and that Congress acted pursuant to its powers under the Fourteenth Amendment when it applied the ADEA to the states. Congress intended to and had authority to abrogate the states' Eleventh Amendment immunity from suit by the 1974 amendments to the ADEA. We clearly have jurisdiction under the ADEA over Mr. Hurd's action against PSU.

## III

## <u>BATSON</u> CHALLENGE

In his appeal, Mr. Hurd, a white plaintiff, claims the district court erred in overruling his <u>Batson</u> challenge to PSU's peremptory strike of the sole African-American juror. In <u>Batson v. Kentucky</u>, 476 U.S. 79, 100 (1986), the Supreme Court prohibited prosecution use of peremptory challenges to exclude jurors in criminal cases solely on the basis of race. That rule has since been applied to civil cases, <u>Edmonson v. Leesville Concrete Co.</u>, 500 U.S. 614, 616 (1991), and to cases where a defendant does not share racial identity with jurors removed by peremptory strikes, <u>Powers v. Ohio</u>, 499 U.S. 400, 415 (1991). "This court reviews a challenge to the improper striking of prospective jurors based on their race de novo, giving deference to the trial court's first-hand observation of the

circumstances of each case." United States v. Hartsfield, 976 F.2d 1349, 1355-56 (10th Cir. 1992). This means "[w]e review de novo whether the . . . explanation is facially race neutral" and then review for clear error the district court's ruling regarding the discriminatory intent of the striking party. United States v. Sneed, 34 F.3d 1570, 1580 (10th Cir. 1994).

A three-step inquiry is used to evaluate a Batson challenge to a peremptory strike. Purkett v. Elem, 115 S. Ct. 1769, 1770-71 (1995) (per curiam). First, the "opponent of a peremptory challenge [must make] out a prima facie case of racial discrimination." Id. at 1770. Then, "the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation" for the strike. Id. "If a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." Id. at 1770-71. The "ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Id. at 1771.

Mr. Hurd timely objected to PSU's strike of Mr. Huie Cunningham, the only African-American juror. The district court then asked PSU to justify its strike. Counsel for PSU stated he had rejected Mr. Cunningham as a juror because "Mr. Cunningham revealed that he was previously involved in jury service where a jury found, in a civil case, for an employee in a railroad benefits

matter." Aplt.'s App., tr. at 80. Both the district court and Mr. Hurd's attorneys corrected PSU's counsel, clarifying that Mr. Cunningham had not actually stated that the jury on which he previously served had rendered a verdict for the plaintiff, only that a verdict had been reached. Id.[7] But the district court went on to conclude that "even if wrong" in recalling what Mr. Cunningham stated, PSU had proffered a satisfactorily race neutral explanation for its strike. Id. The district court then asked Mr. Hurd's counsel to respond, whereupon counsel said that the motivation offered for the strike was not "strong enough" given that it resulted in striking the sole African American and created a jury which was not a "representative cross-section." Id. at 81-82. However, he did not request that PSU be required to offer a better explanation or withdraw the peremptory strike. The district court found that while PSU may have in part relied on an erroneous recollection of what Mr. Cunningham had said about his prior jury service, the strike was "not a discriminatorily based challenge." Id. at 83; see also Hurd III, 892 F. Supp. at 248.[8] The court relied heavily on its observation of the demeanor

---

[7]Mr. Cunningham actually stated that he had served on a "civil case" and that "the jury did reach--render a verdict." Aplt.'s App., tr. at 31. In response to further questioning from the court regarding the nature of the case, Mr. Cunningham recalled that: "It was an employee of a railroad suing for benefits." Id.

[8]Where the proponent "offer[s] a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant ha[s]

(continued...)

of PSU's counsel in determining "not only that counsel was credible, but that he had truthfully represented his belief and intent and had not struck the juror because of the color of his skin." Hurd III, 892 F. Supp. at 248.

On appeal, Mr. Hurd argues that a mistaken belief underpinning a peremptory strike amounts to no reason at all, and thus should not survive a Batson challenge. Mr. Hurd asserts that to uphold a strike once the factual basis is eliminated is tantamount to allowing the proponent of the strike to merely assert his or her good faith as an explanation. In essence, Mr. Hurd urges us to conclude that when a proffered explanation for a strike relies in part[9] on erroneous information or a mistaken belief, it is "pretextual as a matter of law because it [is] contradicted by undisputed facts." Aplt.'s Br. at 2; id. at 10-11.

Mr. Hurd confuses the second and third steps of the Batson inquiry. At the second step, the party making the strike can rebut the presumption of improper motive by proffering a race neutral explanation for its strike. "A neutral

_____

(...continued)
made a prima facie showing becomes moot." Hernandez v. New York, 500 U.S. 352, 359 (1991); United States v. Sneed, 34 F.3d 1570, 1580 (10th Cir. 1994) ("[T]he issue of whether the defendants established a prima facie case of discrimination is moot because the prosecutor gave his explanation . . . and the district court ruled on the ultimate question of intentional discrimination.").

[9]PSU's recollection of Mr. Cunningham's statement was only partly erroneous. Mr. Cunningham had in fact served as a juror on an employment case. That fact alone could support a peremptory strike of Mr. Cunningham absent evidence of pretext.

- 18 -

explanation . . . means an explanation based on something other than the race of the juror." Hernandez v. New York, 500 U.S. 352, 360 (1991). It is not necessary that the "explanation [offered] is persuasive, or even plausible." Elem, 115 S. Ct. at 1771. As long as the proffered reason "does not deny equal protection," the second step in the analysis is satisfied. Id. We agree with the district court that the reason proffered by PSU, although mistaken, was race neutral.[10]

In the third step of the inquiry, the "trial court . . . ha[s] the duty to determine if the [opponent of the strike] has established purposeful discrimination." Batson, 476 U.S. at 98. It is at this stage that the credibility of the proffered reason is tested and the trial court "may choose to disbelieve" the proffered reason. Elem, 115 S. Ct. at 1771 (emphasis omitted). The ultimate burden of persuasion rested with Mr. Hurd to convince the district court that the reason proffered for the strike was unworthy of belief *and* that the strike was racially motivated. Cf. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 514-15 (1993) ("[N]othing in law would permit us to substitute for the required finding

---

[10]Mr. Hurd mistakenly relies on our recent holding in Sneed for the proposition that a mistaken reason cannot constitute a race-neutral proffer. In that case, we upheld a prosecutorial strike based, in part, on a misunderstanding of a juror's response to a question, after additional reasons for the strike were articulated. Sneed, 34 F.3d at 1580. Sneed does not stand for the proposition that when a race-neutral reason for a strike rests in part on a mistaken belief, the burden of the opponent of the strike to show pretext is eliminated.

that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable.").  Unless clearly erroneous, we will defer to the district court's specific factual finding that the proffered reason for the strike was the true reason and that the challenge was not motivated by the juror's race.  Hernandez, 500 U.S. at 365.  In this case, Mr. Hurd did nothing more than note a mistake had been made.  He did not articulate how the mistake, which was an understandable error in recollection, should give rise to an inference of discrimination.  The mere assertion of racial discrimination unsupported by evidence of pretext entitled the district court to conclude that no particular inference of discrimination should be drawn from these circumstances.[11]  Id. at 364 ("[T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal.").  Mr. Hurd failed to carry his burden to show that PSU's peremptory strike was racially motivated.  It was not clear error for the district court to overrule Mr. Hurd's      Batson  challenge or to deny Mr. Hurd's motion for a new trial.

---

[11]Cases in which mistaken beliefs have been held sufficient to support a Batson challenge are distinguishable from the case at bar.  See, e.g., Johnson v. Vasquez, 3 F.3d 1327, 1331 (9th Cir. 1993) (where the inference of intentional discrimination *had already* been raised by the prosecutor's statement that his juror selection changed in response to defense strikes on racial grounds, the prosecutor's "mistaken beliefs [will not] support a challenge free of constitutional taint.").

## IV

## CONCLUSION

For the foregoing reasons, we conclude that <u>Seminole Tribe</u> does not disturb our previous decision that Mr. Hurd was not barred by the Eleventh Amendment from bringing his ADEA suit against PSU.  We also hold that the district court did not err in overruling Mr. Hurd's <u>Batson</u> challenge and in denying Mr. Hurd a new trial.  We **AFFIRM** the judgment of the district court.

95-3236, Hurd v. Pittsburgh State University

Carlos F. Lucero, Circuit Judge, Concurring in part and dissenting in part:

I join the holding that Seminole Tribe of Florida v. Florida, 116 S. Ct. 1114 (1996), does not deprive us of jurisdiction over Mr. Hurd's ADEA claim against the state. I disagree, however, with the majority's analysis of the Batson issue. My review of the record persuades me that plaintiff proved that the asserted reason for the peremptory strike against the only African-American juror was pretextual. In my view, the district court clearly erred when it ruled that the peremptory strike was not racially motivated.

The "Constitution prohibits all forms of purposeful racial discrimination in selection of jurors." Batson v. Kentucky, 476 U.S. 79, 88 (1986); see also Edmonson v. Leesville Concrete Co., 500 U.S. 614, 616 (1991) (applying Batson in a civil context). Our commitment to equal justice under law, carved into stone outside the courthouse, would be mocked by allowing discriminatory peremptory challenges inside. The practice not only causes the silent sting of discrimination, it "mars the integrity of the judicial system and prevents the idea of democratic government from becoming a reality." Edmonson, 500 U.S. at 628.

In this case, plaintiff established a prima facie case of racial discrimination by showing that defendant's attorney excluded the only African American on the

twenty-six person venire, a church pastor named Mr. Cunningham.  See United States v. Joe, 8 F.3d 1488, 1499 (10th Cir. 1993) (peremptory challenge of only Native-American juror on venire establishes prima facie case of purposeful discrimination).  Defendant's attorney justified the strike on grounds that Mr. Cunningham "was previously involved in a jury service where the jury found, in a civil case, for an employee in a railroad benefits matter."  Appellant's App. at 79.  This must be deemed a race-neutral explanation under Purkett v. Elem, 115 S. Ct. 1769, 1771 (1995) ("Unless a discriminatory intent is inherent in the . . . explanation, the reason offered will be deemed race neutral.") (citation and quotation omitted).  See also United States v. Hernandez, 500 U.S. 352, 359 (1991) (plurality opinion) ("In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.").

Although defendant's proffered reason was facially race-neutral, the sequence of events following the proffer demonstrates that it was pretextual. First, plaintiff's attorney explained that the proffered reason was factually wrong. The excluded juror, Mr. Cunningham, never said that the jury returned a verdict for the employee; he said only that the jury reached a verdict.  The district court judge agreed that the proffered reason was inaccurate, and asked defendant's

- 2 -

counsel whether this was "the only basis on which you selected this particular juror." Appellant's App. at 80. Counsel replied, "That's right, your Honor." Id. Thus, the only reason defendant relied upon to strike Mr. Cunningham was known to be untrue by defendant's attorney.[12] Moreover, the reason was exposed as false before the court approved the peremptory challenge, and before Mr. Cunningham learned that he had been struck. Yet defendant's attorney persisted in excluding the sole African-American juror, even after realizing that the reason he gave for the exclusion was incorrect. Under these circumstances, I conclude that the behavior of defendant's attorney establishes discriminatory intent. The district court's contrary findings are based almost entirely on observation of the attorney's demeanor. On this record, the court's generalized statements about a credible demeanor carry little weight.

In reaching a contrary conclusion, the majority faults plaintiff's counsel for not explaining "how the mistake, which was an understandable error in recollection, should give rise to an inference of discrimination." Majority Op. at 20. Counsel did, however, reiterate the facts that gave rise to the inference of

---

[12]Contrary to the majority, I do not rely on Mr. Cunningham's prior jury service in an employment case, because those details were not relied upon by defendant or the district court. The district court regarded the proffered reason as completely inaccurate. Appellant's App. at 26 (finding "as a matter of fact that counsel's belief that this prospective juror had previously reached a plaintiff's verdict, although mistaken, was the true motivation for the peremptory challenge").

discrimination, by pointing out that Mr. Cunningham was the only black person on the entire venire.  See Batson, 476 U.S. at 96 (party trying to prove racial animus "is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" (quoting Avery v. Georgia, 345 U.S. 559, 562 (1953))).  There is little else counsel could have done given he had already shown the falsity of the proffer, because exclusion of a juror for racial reasons can rarely be proven by direct evidence.  Not only does an inference of discrimination continue to arise from the prima facie case but a very strong inference of discrimination was created by counsel's continued reliance on a false reason as justification for the peremptory strike.  What was, perhaps, an understandable error in recollection could no longer be regarded as such, once counsel was alerted to his mistake.

My review of this record leads me to conclude that the peremptory strike against Mr. Cunningham was racially motivated.  I am left with the definite and firm conviction that the district court erred in ruling that race did not motivate the strike.  I respectfully dissent from the majority's holding to the contrary.