COX, Circuit Judge,
concurring in part and dissenting in part:
Congress lacks the constitutional authority to abrogate the states’ Eleventh Amendment immunity to suit in federal court on claims under either the Age Discrimination in Employment Act or the Americans -with Disabilities Act. For that reason, I concur in Judge Edmondson’s conclusion that the states are immune to ADEA suits. I respectfully dissent, however, from the holding that the states do not enjoy the same immunity from ADA suits.
I. Background
Each of the plaintiffs in these three consolidated appeals sued a state instrumentality, asserting claims under the ADEA or ADA. In each case, the state raised a defense of Eleventh Amendment immunity to suit on such claims. In MacPherson v. University of Montevallo, the district court granted the University’s motion to dismiss, concluding that Congress has not, by enacting the ADEA, abrogated the states’ Eleventh Amendment immunity. The district court hearing Kimel v. Florida Board of Regents, on the other hand, denied a similar motion by the Florida Board of Regents. And the Florida Department of Corrections likewise unsuccessfully sought dismissal of ADA and ADEA claims against it in Dickson v. Florida Department of Corrections.
McPherson and the state entities in Dickson and Kimel have appealed the respective rulings. The appeals present two related issues: has Congress abrogated the states’ Eleventh Amendment immunity to suits under (1) the ADEA or (2) the ADA? This court’s review of such issues of law is de novo. See Seminole Tribe v. Florida, 11 F.3d 1016, 1021 (11th Cir.1994), aff'd, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).
II. Discussion
A. • Abrogation
The judicial power of the United States does not extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of that or another state. See U.S. Const, amend. XI; Hans v. Louisiana, 134 U.S. 1, 14-15, 10 S.Ct. 504, 507, 33 L.Ed. 842 (1890). Congress may abrogate the states’ immunity if first it “unequivocally expressed] its intent to abrogate the immunity,” and second it acts “pursuant to a valid exercise of power.” See Seminole Tribe v. Florida, 517 U.S. 44, 54, 116 S.Ct. 1114, 1123, 134 L.Ed.2d 252 (1996) (quoting Green v. Mansour, 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985)).
Congress has provided a clear statement of intent to abrogate in the ADA. The Act provides that “[a] State shall not be immune under the eleventh amendment....” 42 U.S.C. § 12202. As Judge Edmondson points out, the ADEA presents a harder question. On one hand, Congress identified *1445 state employees as potential plaintiffs and the states as potential defendants. On the other hand, Congress never uses the words “Eleventh Amendment” or “immunity.” See Judge Edmondson’s Opinion, supra, at 1433. Notwithstanding the omission of these words, the explicit designation of states as potential defendants has led four circuit courts to conclude that Congress did cléarly intend to abrogate the states’ immunity to ADEA suits. Hurd v. Pittsburg State Univ., 109 F.3d 1540, 1544 (10th Cir.1997); Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 695 (3d Cir.1996) (dictum); Davidson v. Board of Governors of State Colleges & Univs., 920 F.2d 441, 443 (7th Cir.1990); Ramirez v. Puerto Rico Fire Serv., 715 F.2d 694, 698 (1st Cir.1983). The Supreme Court has agreed with this reasoning in other contexts. See Seminole Tribe, 517 U.S. at 56,116 S.Ct. at 1124 (Indian Gaming Act’s designation of states as parties sufficient); Dellmuth v. Muth, 491 U.S. 223, 233,109 S.Ct. 2397, 2403, 105 L.Ed.2d 181 (1989) (Sealia, J., concurring) (“I join the opinion of [four other Justices of] the Court, with the understanding that its reasoning does not preclude congressional elimination of sovereign immunity in statutory text that clearly subjects States to suit for monetary damages, though without explicit reference to state sovereign immunity or the Eleventh Amendment.”); Fitzpatrick v. Bitzer, 427 U.S. 445, 452, 96 S.Ct. 2666, 2670, 49 L.Ed.2d 614 (1976) (Title VU’s designation of states as parties enough).
Fortunately, the thorny issue of Congress’s intent need not be resolved here. Whether or not Congress clearly expressed its intent, it lacks the power to abrogate the states’ immunity to suit in federal court in actions under the ADEA or the ADA. The Supreme Court has identified only one constitutional grant of power, § 5 of the Fourteenth Amendment, under which Congress may defeat the states’ immunity. See Seminole Tribe, 517 U.S. at 58-59, 116 S.Ct. at 1125-28. The Court has recently revisited the limits on that power.
B. Power to Abrogate: City of Boerne v. Flores
In City of Boerne v. Flores,- U.S. -, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Court struck down the Religious Freedom Restoration- Act of 1993 (RFRA), 42 U.S.C. § 2000bb to 2000bb-4. The RFRA prohibited all governmental entities from “substantially burdening” the exercise of religion unless they had a compelling interest for doing so and had employed the “least restrictive means” for furthering that interest. Id. § 2000bb-l(a), (b). With the RFRA’s stringent rule, Congress sought to resurrect the First and Fourteenth Amendment rights that Congress believed the Supreme Court had extinguished in Employment Division v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). A Roman Catholic church in Boerne, Texas, invoked the Act when the town denied the church a permit to add additional worship space. Boerne, — U.S. at -, 117 S.Ct. at 2160. The district court held that the RFRA was beyond Congress’s Fourteenth Amendment powers, and the Supreme Court agreed.
The Court rested this conclusion on a basic principle: The Court is the unique, ultimate authority on the scope of Fourteenth Amendment rights. See id. at -, 117 S.Ct. at 2166. Thus, Congress may not define or declare these rights. See id. Rather, Congress may only enforce the Fourteenth Amendment rights the Supreme Court has recognized. See id. at -, 117 S.Ct. at 2164. Enforcement can include creating some rights beyond those clearly guaranteed by the Constitution. See id. at -, 117 S.Ct. at 2163. But, the Court concluded, such extensions of rights must be proportional to an unconstitutional injury that Congress is seeking to remedy. See id. at -, 117 S.Ct. at 2164.
The RFRA was.not such a proportional response to any injury to constitutional rights. The Court identified two circumstances that showed the RFRA to be “substantive” legislation, as the Court called it, rather- - than enforcement of Fourteenth Amendment guarantees. First, Congress enacted the RFRA without findings (or even hearings) on the existence of widespread violations of any constitutional' right that the Supreme Court has recognized. Id. at -, 117 S.Ct. at 2169. Second, rather than simply remedying any constitutional violations, the RFRA created rights that far exceeded *1446 any the Supreme Court has read the First Amendment to provide. See id. at -, 117 S.Ct. at 2170. Under Smith, generally applicable statutes that incidentally burden religion are permissible, see 494 U.S. at 878-79, 110 S.Ct. at 1600; the RFRA could not be enforcing any First and Fourteenth Amendment right to be free from incidental burdens on religious practice. See Boerne, - U.S. at -, 117 S.Ct. at 2171. Therefore, Congress did not have power under the Fourteenth Amendment to enact the statute.
Boerne thus sets the RFRA outside § 5’s boundary. Two earlier cases, both concerning the Voting Rights Act of 1965, exemplify proper exercise of Congress’s § 5 power. The first case is South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct 803, 15 L.Ed.2d 769 (1966), which rejected a broad attack on most of the geographically restricted provisions of the Voting Rights Act. The second is Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), which upheld a provision of the Act that invalidated New York’s English-literaey voter-qualification rule. Of the two cases, Morgan appears to attribute the broadest powers to Congress, arguably recognizing a congressional power not only to effectuate Supreme Court-identified rights but also to find Fourteenth Amendment rights not yet identified by the Supreme Court. See Morgan, 384 U.S. at 650-51, 86 S.Ct. at 1723-24.
The Boerne Court dismissed the language in Morgan that suggests that Congress has broad powers both to interpret the Fourteenth Amendment and effectuate Fourteenth Amendment rights, Boerne, — U.S. at -, 117 S.Ct. at 2168, but the Court reaffirmed its holdings in these Voting Rights Act cases. Id. at ---, 117 S.Ct. at 2166-68. The differences between the circumstances underlying the Voting Rights Act and those leading to the RFRA are, after all, striking. Before passing the Voting Rights Act, Congress thoroughly documented a history of obvious Fifteenth Amendment violations, and the legislative history indicates that the Act’s primary purpose was to vindicate the Fifteenth Amendment rights that Southern voting laws and practices were defeating. Morgan, 384 U.S. at 648, 86 S.Ct. at 1722; South Carolina, 383 U.S. at 313, 328, 86 S.Ct. at 811, 818-19. Congress took measures tailored to remedy the constitutional violations: the measures were limited to prohibiting patently unconstitutional conduct and establishing policing mechanisms for future violations; they applied only to states where Congress found constitutional violations were the most common; and the Act contained “bailout” provisions to relieve jurisdictions that complied with the Constitution from the Act’s restraints. See Boerne, — U.S. at -, 117 S.Ct. at 2170. The Voting Rights Act effectuated established constitutional guarantees.
Boerne and the Voting Rights Act cases teach us these lessons: Only by respecting Supreme Court interpretations of the Fourteenth Amendment can Congress avoid im-permissibly interpreting the Amendment itself. See Boerne, - U.S. at ---, 117 S.Ct. at 2166-67. Congress nonetheless may, if circumstances warrant, tweak procedures, find certain facts to be presumptively true, and deem certain conduct presumptively unconstitutional in light of Supreme Court interpretation. See South Carolina, 383 U.S. at 328, 333, 335, 86 S.Ct. at 818, 821-22. Thus, legislation enacted pursuant to § 5 must hew to the contours of Supreme Court-defined Fourteenth Amendment rights unless the legislation is a proportional response to a documented pattern of constitutional violation.
C. Is the ADEA Enforcement Legislation?
The ADEA does not qualify under Boerne’s rule as a proper exercise of Congress’s § 5 power.[1] First, the ADEA confers rights far more extensive than those the Fourteenth Amendment provides. Second, *1447 Congress did not enact the ADEA as a proportional response to any widespread violation of the elderly’s constitutional rights.
The Fourteenth Amendment right that the ADEA arguably guards is that of equal protection. The Equal Protection Clause generally prohibits states from treating similarly situated citizens differently. See Romer v. Evans, 517 U.S. 620, 621, 116 S.Ct. 1620, 1623, 134 L.Ed.2d 855 (1996). But the degree of protection varies according to the class of person discriminated against or the interest that the classification compromises. See City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 440-42, 105 S.Ct. 3249, 3254-55, 87 L.Ed.2d 313 (1985). State action that confers different rights, or imposes different duties, on persons belonging to non-suspect classes is permissible if the action has a rational relation to a legitimate governmental interest. See Romer, 517 U.S. at 630, 116 S.Ct. at 1627.
The elderly are not a suspect class, and state action that disadvantages them is constitutional if it passes this rational basis test. See Gregory v. Ashcroft, 501 U.S. 452, 470, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410 (1991); Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 313-14, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976). Under this test, the Supreme Court will not overturn a state measure “unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [people’s] actions were irrational.” Gregory, 501 U.S. at 471, 111 S.Ct. at 2406 (quoting Vance v. Bradley, 440 U.S. 93, 97, 99 S.Ct. 939, 942-43, 59 L.Ed.2d 171 (1979)) (alterations in original). And a state does not violate the Equal Protection Clause “merely because the classifications made by the laws are imperfect.” Id. at 473, 111 S.Ct. at 2407 (quoting Murgia, 427 U.S. at 316, 96 S.Ct. at 2568). Moreover, “those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.”, Vance, 440 U.S. at 111, 99 S.Ct. at 949.
The Supreme Court has put three mandatory retirement age policies to this test, and all have passed. Gregory, 501 U.S. at 452, 111 S.Ct. at 2395 (policy required judges to retire at 70); Vance, 440 U.S. at 93, 99 S.Ct. at 939 (policy required foreign service officers to retire at 60); Murgia, 427 U.S. at 307, 96 S.Ct. at 2562 (policy required police officers to retire at 50). In each case, the policymaker’s perception that mental acuity and physical stamina decline with age was rational basis enough to support the line between those .under the retirement age and those over it. Gregory, 501 U.S. at 472, 111 S.Ct. at 2407; Vance, 440 U.S. at 98-109, 99 S.Ct. at 943-49; Murgia, 427 U.S. at 315-16, 96 S.Ct. at 2567-68. Thus, it is clear that the Supreme Court does not deem all arbitrary treatment offensive to the Fourteenth Amendment. To a spry octogenarian, of course, a mandatory retirement age is arbitrary: it does not permit an assessment of his or her individual capacities. To violate the Equal Protection Clause, however, the arbitrary line itself must have no rational basis. See Gregory, 501 U.S. at 472, 111 S.Ct. at 2407. In short, the Equal Protection Clause permits state action — if it has a rational basis — that may look like arbitrariness.
By contrast, the ADEA was enacted to combat all arbitrariness, unconstitutional or not. Its legislative history shows that Congress particularly deplored, and wished to ban, arbitrary age limits that overlooked some individuals’ abilities. See E.E.O.C. v. Wyoming, 460 U.S. 226, 231, 103 S.Ct. 1054, 1057-58, 75 L.Ed.2d 18 (1983); see also 29 U.S.C. § 621(a)(2) (statement of findings and purpose) (“the setting of arbitrary age limits regardless of potential for job performance has become a common practice”). Not surprisingly, the Supreme Court has read the ADEA to prohibit arbitrary line-drawing— even line-drawing that has a rational basis. “It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age.” Hazen Paper Co. v. Biggins, 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993). “Thus the ADEA commands that ‘employers are to evaluate [older] employees ... on their merits and not their age.’ ... The employer cannot rely oh age as a proxy for an employee’s remaining characteristics, such as productivity, but must instead focus on those factors directly.” Id. at 631, 113 S.Ct. at *1448 1706 (quoting Western Air Lines, Inc. v. Criswell, 472 U.S. 400, 422, 105 S.Ct. 2743, 2756, 86 L.Ed.2d 321 (1985)).
The ADEA accordingly puts mandatory retirement ages to a much more rigorous test than the Equal Protection Clause. A rational basis does not suffice. Criswell, 472 U.S. at 421, 105 S.Ct. at 2755. Rather, “[u]nless an employer can establish a substantial basis for believing that all or nearly all employees above an age lack the qualifications required for the position, the age selected for mandatory retirement less than 70 must be an age at which it is highly impractical for the employer to [e]nsure by individual testing that its employees will have the necessary qualifications for the job.” Id. at 422-23, 105 S.Ct. at 2756; see also Arritt v. Grisell, 567 F.2d 1267, 1271 (4th Cir.1977) (finding a mandatory maximum hiring age violative of ADEA, but not of the Equal Protection Clause).
Mandatory age limits are not the only illustration of the gulf between the elderly’s rights under the Equal Protection Clause and the elderly’s rights under the ADEA. State action that has a disparate impact on old workers probably does not violate the Equal Protection Clause, but it can violate the ADEA. Compare Washington v. Davis, 426 U.S. 229, 239-40, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976) (rejecting a disparate-impact theory of violation of the Equal Protection Clause even for suspect classifications), with MacPherson v. University of Montevallo, 922 F.2d 766, 770-73 (11th Cir.1991) (recognizing a disparate-impact claim theory under the ADEA). Some courts have held that the ADEA so far overshadows equal protection rights that the ADEA has completely displaced 42 U.S.C. § 1983 as a vehicle for an age discrimination claim. See Lafleur v. Texas Dep’t of Health, 126 F.3d 758, 760 (5th Cir.1997); Zombro v. Baltimore City Police Dep’t, 868 F.2d 1364, 1366-67 (4th Cir.1989). Even where such a § 1983 claim is recognized, the Fourteenth Amendment has been held to permit demotion of a worker for the proffered rational reason that new, young, and attractive faces were needed in her stead — practically a paradigmatic ADEA violation. See Izquierdo Prieto v. Mercado Rosa, 894 F.2d 467, 469, 472 (1st Cir.1990). And one court has gone so far as to question the existence of any constitutional right against age-motivated individual employment actions. See Whitacre v. Davey, 890 F.2d 1168, 1169 n. 3 (D.C.Cir.1989).
As one might expect after considering these differences, Congress’s reasons for amending the ADEA to subject states to its restraints did not lie in concern for the Constitution. The reports accompanying the 1974 amendments do not mention the Constitution at all. See H.R.Rep. No. 93-913 (1974), reprinted in 1974 U.S.C.C.A.N. 2811, 2849-50. Congressional debate over the amendments, which were included in the Fair Labor Standards Act of 1974, was silent on constitutional violations. See 120 Cong. Rec. 7306-49, 8759-69 (1974). The supporters simply thought it was a good idea, not that it furthered enforcement of constitutional rights. See 1974 U.S.C.C.A.N. at 2849 (“Discrimination based on age — what some people call ‘age-ism’ — can be as great an evil in our society as discrimination based on race or religion or any other characteristic which ignores a person’s unique status as an individual and treats him or her as a member of some arbitrarily-defined group.”) (quoting Richard M. Nixon Address (March 23,1972)).
In sum, the ADEA has created a new class of rights, but not in response to any threat to constitutional rights. The ADEA thus fails Boerne’s standard for enforcement legislation. Because the ADEA is not a valid exercise of Congress’s § 5 authority, Congress could not have abrogated the states’ Eleventh Amendment immunity to suit.
D. Is the ADA Enforcement Legislation?
The ADA is not a valid enforcement statute for the same two reasons the ADEA is not. First, like the aged, the disabled enjoy no special rights under the Equal Protection Clause.[2] The Supreme Court has never found the disabled to be a suspect or even *1449 quasi-suspect class. City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 445-16, 105 S.Ct. 3249, 3257, 87 L.Ed.2d 313 (1985) (declining to “set out on [the] course” leading to quasi-suspect status for the disabled and infirm); see also Heller v. Doe by Doe, 509 U.S. 312, 321, 113 S.Ct. 2637, 2643, 125 L.Ed.2d 257 (1993) (confirming this position). State action discriminating against the mentally retarded, a subset of the disabled, is subject to only rational basis review. City of Cleburne, 473 U.S. at 446, 105 S.Ct. at 3258. The lower courts have interpreted these holdings to require only rational basis review for all discrimination against the disabled. See, e.g., Lussier v. Dugger, 904 F.2d 661, 670-71 (11th Cir.1990). And this review is not searching: “courts are compelled under rational-basis review to accept a legislature’s generalizations even when there is an, imperfect fit between means and ends.” Heller, 509 U.S. at 321, 113 S.Ct. at 2643.
By contrast, the ADA prohibits distinctions built on generalizations — even if rational. It prohibits discrimination for practically any reason that does not reflect a business necessity. See 42 U.S.C. § 12112(a); see also Pritchard v. Southern Co. Services, 92 F.3d 1130, 1132 (11th Cir.) (listing elements of prima facie ADA claim), amended on reh’g in other part, 102 F.3d 1118 (11th Cir.1996), cert. denied, — U.S. -, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997). It requires assessment of each employee’s abilities and reasonable accommodation to the point of undue hardship. See 42 U.S.C. § 12111(8) (defining “qualified individual with a disability” as one who can perform essential functions of job with reasonable accommodation); id. § 12112(b)(5)(A) (defining discrimination as failure to make reasonable accommodations, unless accommodation would create undue hardship for the employer); H.R.Rep. No. 101-485, at 58, reprinted in 1990 U.S.C.C.A.N. 303, 340 (“[C]overed, entities are required to make employment decisions based on facts applicable to individual applicants or employees, and not on the basis of presumptions as to what a class of individuals with disabilities can or cannot do.”). Thus, the ADA provides much greater protection for the disabled than does the Equal Protection Clause.
The second reason the ADA is not enforcement legislation is that it was unaccompanied by any finding that widespread violation of the disabled’s constitutional rights required the creation of prophylactic remedies. In the legislative history, Congress did not even mention that the ADA was meant to remedy Fourteenth Amendment violations. The committee reports that accompany the Act emphasize the discouraging effect of employment discrimination on the disabled and the costs to society of caring for those who could care for themselves, absent discrimination. See, e.g., H.R.Rep. No. 101-485, at 41-47, reprinted in 1990 U.S.C.C.A.N. 303, 323-29. Far from implying that this state of affairs resulted from violations of any constitutional rights, the legislative history and the Act itself show that Congress was dismayed by the lack of rights the disabled enjoyed before the Act’s passage. See 42 U.S.C. § 12101(a)(4) (“[Individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination^]”); see, e.g., id. at 47-48,1990 U.S.C.C.AN. at 329-30. Altruistic and economic concerns motivated this Act — not defense of the Constitution. The laudability of Congress’s goals provides no exception to the limits on Congress’s Fourteenth Amendment power.
Like the ADEA, the ADA was not enforcement legislation under Boerne’s rule. Congress therefore could not abrogate the states’ immunity.
III. Conclusion
For the foregoing reasons, I would: affirm the dismissal in MacPherson; and reverse the denials of the motions to dismiss in Ki-mel and Dickson, and remand with instructions to dismiss for want of jurisdiction.

. There is pre-Boerne law in other circuits finding the exercise to be proper. See Ramirez v. Puerto Rico Fire Serv., 715 F.2d 694, 699 (1st Cir.1983); E.E.O.C. v. Elrod, 674 F.2d 601, 605 (7th Cir.1982); Arritt v. Grisell, 567 F.2d 1267, 1271 (4th Cir.1977). They share a similar analysis, which has two flaws. First, it rests on broad language in Katzenbach v. Morgan, 384 U.S. at 650-51, 86 S.Ct. at 1723-24, that Boerne has since rejected, - U.S. at -, 117 S.Ct. at 2168. Second, it treats all "discrimination" as equally impermissible under the Equal Protection Clause and therefore within Congress's power to remedy. That is simply not true. Race and age discrimination, for example, are subject to very different degrees of scrutiny.

. Here I respectfully part company with Chief Judge Hatchett and the Ninth, Eighth, and Fifth Circuits. I agree in general with those circuits' analyses of the scope of Congress’s § 5 power. See Autio v. AFSCME, Local 3139, 140 F.3d 802 (8th Cir.1998); Coolbaugh v. Louisiana, 136 F.3d 430, 432 (5th1 Cir.1998); Clark v. California, 123 F.3d 1267, 1270 (9th Cir.), pet. for cert, filed, 66 U.S.L.W. 3308 (1997). The Clark court concludes that the ADA lies within Congress's enforcement power because the Constitution pro *1449 hibits discrimination against disabled people. See id. This reasoning does not go far enough; it matters what kind of discrimination the Constitution prohibits, and whether the ADA was aimed at that kind of discrimination. The Coolbaugh and Autio courts make essentially the same mistake. See Coolbaugh, 136 F.3d at 441 (Smith, J., dissenting).