*1434 HATCHETT, Chief Judge,
concurring in judgment in part, dissenting in part:
I would hold that Congress effectively abrogated the states’ sovereign immunity under the Eleventh Amendment of the United States Constitution in both the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, and the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213. I therefore respectfully dissent from Part I of the Discussion in Judge Edmondson’s opinion, holding that because states are entitled to sovereign immunity under the Eleventh Amendment, private citizens are precluded from bringing lawsuits against such entities in federal court under the ADEA.[1] I concur, however, in the result of Part II of Judge Edmondson’s Discussion, concluding that the states are not entitled to Eleventh Amendment immunity from federal lawsuits under the ADA. I disagree with Judge Cox’s analysis in its entirety and feel compelled to address, in particular, his assertion that the ADEA and the ADA are not “valid enforcement” legislation pursuant to Congress’s power under Section 5 of the Fourteenth Amendment.[2]
Congress may exercise its power to abrogate the states’ Eleventh Amendment immunity if (1) it “has ‘unequivocally expresse[d] its intent to abrogate the immunity’”; and (2) it “has acted ‘pursuant to a valid exercise of power.’ ” Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252, 266 (1996) (quoting Green v. Mansour, 474 U.S. 64, 68, 106 S.Ct. 423, 425, 88 L.Ed.2d 371 (1985)) (alteration in original). Congress must make its intent “unmistakably clear in the language of the statute.” Seminole Tribe, 517 U.S. at 54, 116 S.Ct. at 1122, 134 L.Ed.2d at 266 (quoting Dellmuth v. Muth, 491 U.S. 223, 228, 109 S.Ct. 2397, 2400, 105 L.Ed.2d 181 (1989)). If the court finds that Congress clearly expressed its intent to abrogate the states’ immunity, the next inquiry is whether Congress enacted the legislation in question “pursuant to a constitutional provision granting [it] the power to abrogate[.]” Seminole Tribe, 517 U.S. at 58, 116 S.Ct. at 1124, 134 L.Ed.2d at 268.[3] A statute is “appropriate legislation” to enforce the Equal Protection Clause of the Fourteenth Amendment if it “may be regarded as an enactment to enforce the Equal Protection Clause, [if] it is ‘plainly adapted to that end’ and [if] it is not prohibited by but is consistent with ‘the letter and spirit of the constitution.’ ” Clark v. California, 123 F.3d 1267, 1270 (9th Cir.) (quoting Katzenbach v. Morgan, 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966)) (alterations in original), petition for cert. filed, 66 U.S.L.W. 3308 (U.S. Oct. 20,1997) (No. 97-686).
I. Congress’s Intent to Abrogate the States’ Immunity

A. The ADEA

The ADEA makes it unlawful for an “employer” “to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual’s age[.]” 29 U.S.C. § 623(a)(1) (1994). In 1974, Congress amended the definition of “employer” to include “a State or political subdivision of a State and any agency or instrumentality of a State or a political subdivision of a State,” and deleted text explicitly excluding such entities from that definition. 29 U.S.C. § 630(b)(2) & note (1994).[4] The ADEA explicitly provides that employ *1435 ers who 'violate the statute are subject to liability for legal and equitable relief. See 29 U.S.C. § 626(b) (1994) (“In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter....”); 29 U.S.C. § 626(c)(1) (1994).
I agree with the parties in Kimel — including the Florida Board of Regents — and with virtually every other court that has addressed the question, including all three district courts in the underlying cases, that Congress made an “unmistakably clear” statement of its intent to abrogate the states’ sovereign immunity in the ADEA. See Hurd v. Pittsburg State Univ., 109 F.3d 1540, 1544 (10th Cir.1997); Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 695 (3d Cir.1996); Davidson v. Board of Governors of State Colleges & Univs. for W. Ill. Univ., 920 F.2d 441, 443 (7th Cir.1990). “Unless Congress had said in so many words that it was abrogating the states’ sovereign immunity in age discrimination cases — and that degree of explicitness is not required — it could not have made its desire to override the states’ sovereign immunity clearer.” Davidson, 920 F.2d at 443 (internal citations omitted); see also Edmondson, J., at 21 n. 15 (“I do not say that certain magic words must be used to abrogate immunity. I accept that Congress could unmistakably signal abrogation of immunity in a variety of ways, and we write no general rules today.”). As the Third Circuit persuasively pointed out, [t]he statute simply leaves no room to dispute whether states and state agencies are included among the class of potential defendants when sued under the ADEA for their actions as ‘employers.’” Blanciak, 77 F.3d at 695; see also Seminole Tribe, 517 U.S. at 57, 116 S.Ct. at 1124, 134 L.Ed.2d at 266-67 (relying on the references to the “State” in the text of the statute in question to conclude that such references “[made] it indubitable that Congress intended through the Act to abrogate the States’ sovereign immunity from suit”).[5]
I take issue with my colleague’s reliance on the facts that “[n]o reference to the Eleventh Amendment or to States’ sovereign immunity is included [in the ADEA,]” “[n]or is there, in one place, a plain, declaratory statement that States can be sued by individuals in federal court.” Edmondson, J., at 1418. Athough Judge Edmondson states that we do not require Congress to use any “magic words” to abrogate effectively the states’ sovereign immunity, and that Congress may “unmistakably signal abrogation of immunity in a variety of ways,” I believe that his opinion, in essence, is requiring exactly that. Edmondson, J., at 1420 n. 15. If Congress has not sufficiently expressed its intent to abrogate the states’ immunity through including “States” in the definition of “employer” in,the ADEA, after this decision, I cannot imagine in what other “variety of .ways” Congress can signal the abrogation of the states’ immunity, other than through the use of *1436 “magic words.” The Court in Seminole Tribe did not require that Congress use any talismanic language to express its intent to abrogate, and could easily have done so. As I do not believe that Seminole Tribe requires Congress to use any particular words to express effectively its intent to abrogate the states’ immunity, and because I believe that Congress’s intent is clear in the language of the ADEA, I conclude that the first criterion of Seminole Tribe is satisfied. See EEOC v. Wyoming, 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 . L.Ed.2d 18 (1983) (“[T]here is no doubt what the intent of Congress was: to extend the application of the ADEA to the States.”); Gregory v. Ashcroft, 501 U.S. 452, 467, 111 S.Ct. 2395, 2404, 115 L.Ed.2d 410 (1991) (“[The] ADEA plainly covers all state employees except those excluded by one of the exceptions.”); Fitzpatrick v. Bitzer, 427 U.S. 445, 452, 96 S.Ct. 2666, 2669, 49 L.Ed.2d 614 (1976) (concluding that Congress’s designation of states as parties in Title VII was sufficient to abrogate the states’ immunity).

B. The ADA

The ADA presents an easier case under Seminole Tribe’s “clear statement” standard, as both Judges Edmondson and Cox agree. See Edmondson, J., at 1420 n. 15; Cox, J., at 1444. Within the statute’s text, Congress explicitly provided:
A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.
42 U.S.C. § 12202 (1994). Accordingly, I find that Congress “unequivocally expressed” its intent to abrogate the states’ sovereign immunity in section 12202 of the ADA See Autio v. AFSCME, Local 3139, No. 97-3145 (8th Cir. Apr. 9, 1998); Coolbaugh v. Louisiana, 136 F.3d 430, 433 (5th Cir.1998) (finding Congress’s intent to abrogate the states’ immunity under the ADA “patently clear”); Clark, 123 F.3d at 1269-70.[6]
II. Congress’s Power to Abrogate the States’ Immunity
In addition to clearly expressing its intent, Congress also must have acted pursuant to its authority under Section 5 of the Fourteenth Amendment to abrogate successfully the states’ Eleventh Amendment immunity. See Seminole Tribe, 517 U.S. at 58, 116 S.Ct. at 1124, 134 L.Ed.2d at 268. Judge Cox asserts that, regardless of whether Congress clearly expressed its intent to abrogate the states’ immunity from lawsuits in federal court under both the ADEA and the ADA, Congress lacks the constitutional authority to do so under these statutes, relying on the Supreme Court’s recent decision in City of Boerne v. Flores, — U.S. -, 117 S.Ct. 2157,138 L.Ed.2d 624 (1997). In Boerne, the Supreme Court held that Congress exceeded its Section 5 authority in enacting the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb to 2000bb-4, through which Congress sought to reinstate a previous, more stringent standard of review for free exercise of religion claims.[7] The Court *1437 found that Congress was not enforcing rights under the Fourteenth Amendment, which it undeniably has the power to do, but was attempting to create rights that the Constitution did not guarantee. See Boerne, — U.S. at -, 117 S.Ct. at 2170, 138 L.Ed.2d at 646. In other words, Congress had imper-missibly enacted “substantive” legislation. Judge Cox states that ‘Boerne and the Voting Rights Act eases teach us [that] [o]nly by respecting Supreme Court interpretations of the Fourteenth Amendment can Congress avoid impermissibly interpreting the Amendment itself.” Cox, J., at 1445.1 interpret his analysis to limit, in an unallowable manner, the power of Congress and thus, disagree.

A. The ADEA

Judge Cox asserts that the ADEA was not a proper exercise of Congress’s Section 5 power under the Boerne analysis for two main reasons. First, he alleges that the statute confers more extensive rights to individuals than does the Equal Protection Clause of the Fourteenth Amendment. In essence, Judge Cox alleges that the ADEA puts “mandatory retirement ages” and “mandatory age limits” to a much more rigorous test than the Equal Protection Clause requires. Cox, J., at 1447. In addition, Judge Cox asserts that “Congress did not enact the ADEA as a proportional response to any widespread violation of the elderly’s constitutional rights[,]” because, among other reasons, the legislative history accompanying the 1974 amendment to the ADEA did not mention the Constitution or constitutional violations. Cox, J., at 1444,1447.
To the contrary, like many other circuit courts, I conclude that the ADEA falls squarely within the enforcement power that Section 5 of the Fourteenth Amendment confers on Congress. See Hurd, 109 F.3d at 1545-46; Ramirez v. Puerto Rico Fire Serv., 715 F.2d 694, 699-700 (1st Cir.1983); EEOC v. Elrod, 674 F.2d 601, 608-09 (7th Cir.1982); Arritt v. Grisell, 567 F.2d 1267, 1270-71 (4th Cir.1977). Congress enacted the ADEA to remedy and prevent what it found to be a pervasive problem of arbitrary discrimination against older workers. Such protection is at the core of the Fourteenth Amendment’s guarantee of equal protection under the law. Even though Congress arguably has gone further in proscribing government employment practices that discriminate on the basis of age than have the courts in adjudicating claims under the Fourteenth Amendment, this merely reflects the differing roles of Congress and the courts.

1. Congress enacted the ADEA to “enforce” rights under the Equal Protection Clause of the Fourteenth Amendment.

In Boerne, Congress legislated a constitutional standard of review for the judiciary. Contrary to Judge Cox’s assertions, I do not find this to be the case under the ADEA. In general, the Equal Protection Clause proscribes states from treating similarly situated persons within their jurisdictions differently and assures that governments will differentiate between their citizens only upon reasonable grounds that have a relationship to the desired goals. See, e.g., Romer v. Evans, 517 U.S. 620, 630-32, 116 S.Ct. 1620, 1627-28, 134 L.Ed.2d 855, 865-67 (1996); Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992); City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 446, 105 S.Ct. 3249, 3257, 87 L.Ed.2d 313 (1985) (“The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.”). Although age is not a “suspect” or quasi-suspect classification deserving of close judicial scrutiny under the Equal Protection Clause, the Fourteenth Amendment’s equal protection guarantees are not limited solely to members of a few protected groups.[8] See, e.g., Cleburne, 473 U.S. at 447, 105 S.Ct. at 3258 (“[T]he [disabled], like others, have and retain their substantive constitutional rights in addition to the right to be treated equally by the law.”).. Every person has a right to be free *1438 from government classifications based on arbitrary or irrational criteria, and Congress’s power is not limited to “the protection of those classes found by the Court to deserve ‘special protection’ under the Constitution.’ ” Clark, 123 F.3d at 1270-71. But cf. Wilson-Jones v. Caviness, 99 F.3d 203, 210 (6th Cir.1996) (stating that the court will not “regard” a legislation that does not affect a judicially-recognized “specially protected” class, as an enactment “to enforce the Equal Protection Clause” unless Congress explicitly stated that it is enforcing that clause), amended on other grounds, 107 F.3d 358 (1997).
Additionally, Congress has not exceeded its authority to enforce the Equal Protection Clause simply because the ADEA may impose liability involving distinctions based on age that a court would not find to be “irrational” under that clause. It is undisputed that Congress’s power to enforce the rights to equal protection of the law under Section 5 is not unlimited. Congress cannot “decree the substance of the Fourteenth Amendment’s restrictions on the States[,]” or alter “what the right[s][are].” Boerne, — U.S. at -, 117 S.Ct. at 2164, 138 L.Ed.2d at 638. It has long been established, however, that “[l]egislation which deters and remedies constitutional violations can fall within the sweep of Congress’ enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into ‘legislative spheres of autonomy previously reserved to the States.’ ” Boerne, — U.S. at —, 117 S.Ct. at 2163, 138 L.Ed.2d at 637 (quoting Fitzpatrick, 427 U.S. at 455, 96 S.Ct. at 2670) (emphasis added). The Boerne Court cited, as an example, its upholding the suspension of various voting requirements, such as literacy tests, under Congress’s parallel power to enforce the Fifteenth Amendment to combat racial discrimination in voting “despite the facial constitutionality of the tests under Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959).” Boerne, — U.S. at —, 117 S.Ct. at 2163, 138 L.Ed.2d at 637; see also Scott v. City of Anniston, 597 F.2d 897, 899, 900 (5th Cir.1979) (“The fourteenth amendment empowers Congress to enact appropriate legislation establishing more exacting requirements than those minimum safeguards provided in the amendment[,]” as long as Congress does so “to carry out the purpose of [the] amendment ].”), cert. denied, 446 U.S. 917, 100 S.Ct. 1850, 64 L.Ed.2d 271 (1980). Courts must accord Congress “wide latitude” in determining where to draw the line between measures that prevent or remedy unconstitutional actions and those that make substantive changes in the governing law. Boerne, — U.S. at -, 117 S.Ct. at 2163, 138 L.Ed.2d at 638.
Thus, it is clear that Congress does not merely have to “rubber stamp” the constitutional violations that the Supreme Court has already found to exist; nor does it have to legislate to remedy only that conduct that the Court would find unconstitutional, even though the Court has not yet so ruled. See Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976) (stating in dicta that the rational-basis inquiry “reflect[s] the Court’s awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one”).[9] Such an interpretation would essentially render meaningless Congress’s power to enforce the Fourteenth Amendment, which is separate and distinct from the power of the judiciary to interpret the Constitution. See Katzenbach, 384 U.S. at 648-49, 86 S.Ct. at 1721-22.
In Katzenbach v. Morgan, the Supreme Court rejected the state’s argument that section 4(e) of the Voting Rights Act could not be sustained as appropriate legislation to enforce the Equal Protection Clause unless the courts decided that the clause forbade that section’s English literacy requirement. 384 U.S. at 648-50, 86 S.Ct. at 1721-22. The Court stated:
A construction of § 5 that would require a judicial determination that the enforcement of the state law precluded by Congress violated the [Fourteenth] Amendment, as a condition of sustaining the congressional enactment, would depreciate both congressional resourcefulness and congressional responsibility for imple- *1439 meriting the Amendment. It would confine the legislative power in this context to the insignificant role of abrogating only those state laws that the judicial branch was prepared to adjudge unconstitutional, or of merely informing the judgment of the judiciary by particularizing the “majestic generalities” of § 1 of the Amendment.
Katzenbach, 384 U.S. at 648-49, 86 S.Ct. at 1721-22 (footnote omitted). I decline to read such a limitation of Congress’s power into the Boerne decision, and find any assertion that the ADEA may not reach practices that are not themselves unconstitutional simply to be wrong.

2. The ADEA is an appropriate, proportional remedial measure to address age discrimination.

In order for the courts to consider legislation to be “remedial,” and not substantive, in nature, “a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end” must exist. Boerne, — U.S. at -, 117 S.Ct. at 2164, 138 L.Ed.2d at 638. After reviewing the text and legislative history of the ADEA and its amendments, I conclude that Congress, in addressing arbitrary age discrimination in employment, satisfied this requirement. See generally Wyoming, 460 U.S. at 229-33, 103 S.Ct. at 1056-68 (discussing the ADEA’s legislative history); Elrod, 674 F.2d at 604-07 (same).
The preamble to the ADEA provides Congress’s findings regarding, among other things, “arbitrary age limits regardless of potential for job performance [that] has become a common practice,” and “arbitrary discrimination in employment because of age,” and states that one of the Act’s purposes is to prohibit such discrimination. 29 U.S.C. § 621 (1994). In the 1950s, Congress began its endeavors to prohibit arbitrary age discrimination. See Wyoming, 460 U.S. at 229, 103 S.Ct. at 1056. During floor debates concerning the enactment of Title VII of the Civil Rights Act of 1964, amendments to include age along with Title VU’s protected classes were rejected “in part on the basis that Congress did not yet have enough information to make a considered judgment about the nature of age discrimination^]” Wyoming, 460 U.S. at 229, 103 S.Ct. at 1056 (citing 110 Cong. Rec. 2596-99, 9911-13, 13490-92 (1964)). Congress thus directed the Secretary of Labor (Secretary) to conduct a “full and complete” study on age discrimination in employment. Wyoming, 460 U.S. at 230, 103 S.Ct. at 1057. The Secretary issued the report about a year later, finding, among other things, that (1) employment age discrimination was generally based on unsupported stereotypes and was often defended on pretextual grounds; and (2) the empirical evidence showed that arbitrary age limits were unfounded overall, as older workers, on average, performed as well as younger workers. Wyoming) 460 U.S. at 230-31, 103 S.Ct. at 1057-58. Thereafter, committees in the Senate and the House of Representatives conducted extensive hearings, on proposed legislation prohibiting such discrimination, and the Secretary’s findings “were confirmed throughout the extensive factfinding undertaken by the Executive Branch and Congress.” Wyoming, 460 U.S. at 230-31, 103 S.Ct. at 1057-58.
In March 1972, around the same time that Congress considered and passed amendments under Section 5 extending Title VII's application to state and local government employees, Senator Bentsen first introduced legislation to extend the ADEA to government employees. Elrod, 674 F.2d at 604 (citing 118 Cong. Rec. 7745 (1972), and Equal Employment Opportunity Act of 1972, Pub.L. No. 92-261, 86 Stat. 103). After Senator Bentsen again presented the proposed amendment in May 1972, arguing that Title VII’s underlying principles were “directly applicable” to the ADEA, the Senate voted unanimously in favor of the ADEA amendment. Elrod, 674 F.2d at 604-05 (citing 118 Cong. Rec. 15894, 15895 (1972)). The amendment, however,, initially failed to pass House-Senate conference committees. El-rod, 674 F.2d at 605. Although little legislative history exists concerning the 1974 amendment to the ADEA, and Congress made no mention of a specific constitutional provision, both the House and the Senate cited President Nixon’s remarks in 1972 to indicate the congressional purpose of the amendment:
Discrimination based on age — what some people call “age-ism” — can be as great an *1440 evil in our society as discrimination based on race or religion or any other characteristic which ignores a person’s unique status as an individual and treats him or her as a member of some arbitrarily-defined group. .Especially in the employment field, discrimination based on age is cruel and self-defeating; it destroys the spirit of those who want to work and it denies the Nation[ ] the contribution they could make if they were working.
Elrod, 674 F.2d at 605 (quoting S.Rep. No. 93-690, 93d. Cong., 2d Sess. 55 (1974), and H.R.Rep. No. 93-913, 93d Cong., 2d Sess., reprinted in [1974] U.S.C.C.A.N. 2811, 2849).[10] In addition, Senator Bentsen commented that “[t]he passage of [the ADEA amendment] insures that Government employees will be subject to the same protections against arbitrary employment [discrimination] based on age as are employees in the private sector.” Elrod, 674 F.2d at 605 (quoting 120 Cong. Rec. 8768 (1974)).[11]
In light of the above, I conclude that the ADEA qualifies as a valid enforcement provision under Congress’s Section 5 power. The text and history of the ADEA demonstrate a congressional focus, including extensive fact-finding on arbitrary age discrimination, and its resulting harm, in the employment practices of private and public employers — discrimination that had become a “common practice” and was often unrelated to legitimate employment goals. See 29 U.S.C. § 621 (1994). “[I]t is clear that the purpose of the [1974 amendment to the ADEA] was to prohibit arbitrary, discriminatory government conduct that is the very essence of the guarantee of ‘equal protection of the laws’ of the Fourteenth Amendment.” Elrod, 674 F.2d at 604; see also Ramirez, 715 F.2d at 699 (stating that Congress extended ADEA coverage “to shield public employees from the invidious effects of age-based discrimination. The 1974 amendment, like the ADEA itself, ‘is aimed at irrational, unjustified employment decisions based upon assumptions about the relationship between age and ability which classify older workers as incapable of effective job performance.’ ”) (quoting El-rod, 674 F.2d at 605).[12]

*1441
B. The ADA

With respect to the ADA, Judge Cox states that the statute is not valid enforcement legislation for the same reasons that he rejected the ADEA. First, he asserts that because the disabled are not a suspect or quasi-suspect class, and thus enjoy no special rights under the Equal Protection Clause, the ADA provides them with greater protection than does the Equal Protection Clause. His second reason is that the ADA “was unaccompanied by any finding that widespread violation of the disabled’s constitutional rights required the creation of prophylactic remedies].,]” and states that “[a]ltruistic and economic ■ concerns motivated [the ADA] — not defense of the Constitution.” Cox, J., at 1448. For reasons similar to my analysis of the ADEA, I disagree.
As an initial matter, I acknowledge that, unlike in the ADEA, Congress explicitly invoked its enforcement power under the Fourteenth Amendment in the ADA. See 42 U.S.C. § 12101(b)(4) (1994) (“It is the purpose of [the ADA] ... to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-today by people with disabilities.”). I emphasize, however, that, similar to Congress’s expression of its intent, Congress is not required to use any magic words to invoke its authority to enforce the Fourteenth Amendment under Section 5 before abrogating the states’ immunity. See supra p. 1445; see also Clark, 123 F.3d at 1271 (“Although ‘the constitutionality of action taken by Congress does not depend on recitals of power which it undertakes to exercise,’ we give great deference to congressional statements.”) (quoting Woods v. Cloyd W. Miller Co., 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948)). In EEOC v. Wyoming, the Supreme Court rejected that very suggestion, and stated:
It is in the nature of our review of congressional legislation defended on the basis of Congress’ powers under § 5 of the Fourteenth Amendment that we be able to discern some legislative purpose or .factual predicate that supports the exercise of that power. That does not mean, however, that Congress need anywhere recite the words “section 5” or “Fourteenth Amendment” or “equal protection,” see, e.g., Fullilove v. Klutznick, 448 U.S. 448, 476-78, 100 S.Ct. 2758, 2773-74, 65 L.Ed.2d 902 (1980) (Burger, C.J.), for “[t]he ... constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.” Woods v. Cloyd W Miller Co, 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948).
460 U.S. at 243 n. 18, 103 S.Ct. at 1064 n. 18. The question, therefore, is not whether Congress explicitly relied on the Fourteenth • Amendment when it enacted the ADA, but whether the statute is within Congress’s authority under that amendment. See Ramirez, 715 F.2d at 698 (“The omission of any ritualistic incantation of powers by the Congress is not determinative, for there is no requirement that the statute incorporate buzz words ... ”); Elrod, 674 F.2d at 608 (“[T]he test of whether legislation is enacted pursuant to § 5 of the Fourteenth Amendment requires no talismanic intoning of the amendment. Rather, the inquiry is whether the objectives of the legislation are within Congress’. power under the amendment.”) (internal citation and fpotnote omitted). That being said, I now turn to the substantive analysis of the ADA.
First, I do not agree with Judge Cox’s equal protection argument concerning the ADA for the same reasons I declined to accept this argument with respect to the ADEA. Although, like older individuals, the disabled are not a suspect or quasi-suspect class — and therefore are not entitled to the higher level of judicial scrutiny under the Equal Protection Clause that courts accord state action affecting such classes — the disabled are still entitled to the equal protection of the law against arbitrary discrimination, as is every person. See Cleburne, 473 U.S. at 446, 105 S.Ct. at 3257 (“Our refusal to recognize the [disabled] as a quasi-suspect class does not leave them entirely unprotected from invidious discrimination.”). Like the Ninth Circuit, I find no authority for the idea that “the Court’s choice of a level of scrutiny for purposes of judicial review should be the boundary of the legislative power under the Fourteenth Amendment[.]” Clark, 123 F.3d at 1271. I therefore conclude — especially in *1442 light of the congressional history of the ADA as discussed below — that Congress did not exceed its authority in enacting that statute simply because the ADA may impose liability in situations that the courts would not find to violate judicial standards under the Equal Protection Clause. I consider the ADA to be legislation that falls within the sweep of Congress’ enforcement power to “prohibit[ ] conduct which is not itself unconstitutional.” Boerne, — U.S. at -, 117 S.Ct. at 2163, 138 L.Ed.2d at 637.
Additionally, I disagree with the assertion that Congress was not concerned with constitutional violations when it enacted the ADA, and thus that the statute is not valid enforcement legislation under its Section 5 power. The ADA is “appropriate legislation” to enforce the Equal Protection Clause, as it may be regarded as an enactment to enforce that clause, is plainly adapted to that end and “is not prohibited by but is consistent with the letter and spirit of the [Constitution.” Clark, 123 F.3d at 1270 (internal quotation marks omitted); see also Autio v. AFSCME, Local 3139, 140 F.3d 802 (8th Cir.1998) (concluding that Congress validly enacted the ADA to enforce the Equal Protection Clause through the exercise of its Section 5 power); Coolbaugh, 136 F.3d at 438 (“[T]he ADA represents Congress’ considered efforts to remedy and prevent what it perceived as serious, widespread discrimination against the disabled.”).
Congress considered an abundance of evidence and made extensive findings in the ADA concerning the extent of the discrimination against, and resulting harm to, the disabled to support the statute’s enactment. See Coolbaugh, 136 F.3d at 436-37 (stating that both the House and the Senate cited seven substantive studies or reports and “a wealth of testimonial and anecdotal evidence from a spectrum of parties to support the finding of serious and pervasive discrimination”). In particular, it found that:
(1) some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older;
(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;
(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;
(4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;
(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities; [and]
(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and edueationally[.]
42 U.S.C. § 12101(a) (1994); Coolbaugh, 136 F.3d at 435. Congress also observed that:
(7) individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society;
(8) the Nation’s proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, *1443 independent living, and economic self-sufficiency for such individuals; and
(9) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary .expenses resulting from dependency and nonproductivity.
42 U.S.C. § 12101(a) (1994); Coolbaugh, 136 F.3d at 435 n. 3.[13] As the Supreme Court has stated, “It is for Congress in the first instance to ‘determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,’ and its conclusions are entitled to much deference.” Boerne, — U.S. at -, 117 S.Ct. at 2171, 138 L.Ed.2d at 649 (quoting Katzenbach, 384 U.S. at 651, 86 S.Ct. at 1723) (alteration in original); Coolbaugh, 136 F.3d at 436 (“Deference to the judgment of Congress is particularly appropriate in this case, because in Cleburne, the Court identified Congress as the ideal governmental branch to make findings and decisions regarding the legal treatment of the disabled.”) (citing 473 U.S. at 442-43, 105 S.Ct. at 3255-56); Cleburne, 473 U.S. at 442-43, 105 S.Ct. at 3255-56 (“How this large and diversified group is to be treated under the law is a difficult and often a technical matter, very much a task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary.”). In light of these explicit congressional findings, I find it abundantly clear that Congress was concerned about the “defense of the Constitution” in enacting the ADA.
Overall, viewing the remedial measures in light of the evils presented, both the ADEA and the ADA were valid enactments of Congress to redress discrimination pursuant to its enforcement power under Section 5. of the Fourteenth Amendment. Additionally, because the dangers that the Court found inherent in the RFRA are not present in the ADEA and the ADA, I find Boerne distinguishable. Boerne, — U.S. at -, 117 S.Ct. at 2170, 138 L.Ed.2d at 647 (stating that “[t]he reach and scope of [the] RFRA distinguish it from other measures passed under Congress’ enforcement power_”). First, th,e ADEA and the ADA did not pose the same threat as the RFRA to the separation of powers principles, because “Congress included no language attempting to upset the balance of powers and usurp the Court’s function of establishing a standard of review by establishing a standard different from the one previously established by the Supreme Court.” Coolbaugh, 136 F.3d at 438.[14] Second, unlike the ADEA and the ADA, the RFRA “prohibited] official actions of almost every description and regardless of subject matter.” Boerne, — U.S. at -, 117 S.Ct. at 2170, 138 L.Ed.2d at 646. Neither the ADEA nor the ADA “is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.” Boerne, — U.S. at -, 117 S.Ct. at 2170, 138 L.Ed.2d at 646; see also Coolbaugh, 136 F.3d at 437 (“Congress’ scheme in the ADA to provide a remedy to the disabled who suffer discrimination and to prevent such discrimination is not so draconian or overly sweeping to be considered disproportionate to the serious threat of discrimination Congress perceived.”); Clark, 123 F.3d at 1270. Finally, the standard of review set forth in the RFRA was “the most demanding test known to constitutional law[,]” and imposed an additional requirement on state action that the previous judicial standard that Congress attempted to reinstate, ie., that the state action be the least restrictive means *1444 of fulfilling the state’s interest, had not imposed. See Boerne, — U.S. at -, 117 S.Ct. at 2171, 138 L.Ed.2d at 648. The same simply cannot be said for analysis of claims under the ADEA and ADA.
In general,
[t]he extension of the ADEA [and the ADA]- to the states insures uniformity and greater compliance with [those statutes]. It also eliminates the anomaly that government is not bound by public policy. As Justice Brennan remarked in a related context: “How ‘uniquely amiss’ it would be, therefore, if the government itself— ‘the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct’ — were permitted to disavow liability for the injury it has begotten.”
Elrod, 674 F.2d at 612 (quoting Owen v. City of Independence, 446 U.S. 622, 651, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980)).
III. CONCLUSION
For the foregoing reasons, I would hold that Congress effectively abrogated the states’ sovereign immunity in enacting the ADEA as well as the ADA. Therefore, I would affirm the district courts’ decisions in Kimel and Dickson, and would reverse the district court’s decision in MacPherson. Accordingly, I concur only in the judgment of Part II of Judge Edmondson’s opinion and otherwise respectfully dissent.

. For the sake of brevity, I will' use the term "states" to refer to states and their agencies and instrumentalities.

. Because Judge Cox provides the determining vote that states are entitled to sovereign immunity under the ADEA — albeit for a reason different from that of Judge Edmondson — my opinion with respect to the court's ADEA analysis is a dissent. With regard to the ADA, however, I merely write separately to uphold the applicability of that statute to the states, as did Judge Edmondson.

. In Seminole Tribe, the Supreme Court overruled Pennsylvania v. Union Gas Co., 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), and held that Congress has no authority to abrogate the states' sovereign immunity when acting pursuant to the Commerce Clause, hut can abrogate their immunity under Section 5 of the Fourteenth Amendment. 517 U.S. at 58, 63, 116 S.Ct. at 1125, 1128, 134 L.Ed.2d at 268, 273.

. As a result, “employee” under the ADEA includes those persons who work for states and their agencies. See 29 U.S.C. § 630(0 (1994) *1435 (with some exceptions, "[t]he term ‘employee’ means an individual employed by any employer....").

. I disagree that Employees of the Dep't of Public Health & Welfare v. Department of Public Health & Welfare, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), concluding that Congress did not clearly express its intent to abrogate the states' immunity in enacting the 1966 amendments to the Fair Labor Standards Act (FLSA), calls into question Congress’s intent to abrogate the states’ immunity under the ADEA. In 1974, Congress specifically amended the . FLSA to address the concerns of the Employees Court and to authorize lawsuits against the states in federal court. See Mills v. Maine, 118 F.3d 37, 42 (1st Cir.1997) (stating that “we agree with the other courts of appeals that have examined the FLSA’s provisions and have concluded that the Act contains the necessary clear statement of congressional intent to abrogate state sovereign immunity”); Hurd, 109 F.3d at 1544 n. 3; Reich v. New York, 3 F.3d 581, 590, 591 (2d Cir.1993) (stating that “Congress amended [the FLSA] with the intent that states and their political subdivisions would thereafter be subject to suit in federal court for violations of the FLSA[,]” and finding that "Congress has made its intent to abrogate the states’ sovereign immunity abundantly clear in the language of the FLSA, as amended in 1974 and 1985"), cert. denied, 510 U.S. 1163, 114 S.Ct. 1187, 127 L.Ed.2d 537 (1994), overruled on other grounds, Close v. New York, 125 F.3d 31, 38 (2d Cir.1997) (“[W]e can no longer justify congressional abrogation under the Interstate Commerce Clause, and to the extent that Reich permits such abrogation, we hold Reich is no longer good law.’’); Hale v. Arizona, 993 F.2d 1387, 1391 (9th Cir.) (era banc ) (stating that Congress clearly intended to abrogate the states' sovereign immunity in the 1974 amendments to the FLSA), cert. denied, 510 U.S. 946, 114 S.Ct. 386, 126 L.Ed.2d 335 (1993).

. I must emphasize, however, that I do not conclude, or imply, that Congress is required to use any “magic words” to express effectively its intent to abrogate the states' immunity. I conclude only that Congress’s intent under the ADA is clear.

. In Employment Division, Dep’t of Human Resources v. Smith, 494 U.S. 872, 883-87, 110 S.Ct. 1595, 1602-04, 108 L.Ed.2d 876 (1990), the Supreme Court declined to apply the balancing test for analyzing free exercise claims set forth in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and held that "neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest.” Boerne, - U.S. at -, 117 S.Ct. at 2161, 138 L.Ed.2d at 635. Congress then enacted the RFRA, seeking "to restore the compelling interest test as set forth in Sherbert [,] ... and to guarantee its application in all cases where free exercise of religion is substantially burdened_" 42 U.S.C. § 2000bb(b)(1) (1994). Thus, "[the] RFRA prohibit[ed] ‘government’ from ‘substantially burdening]’ a person’s exercise of religion even if the burden resulted] from a rule of general applicability unless the government [could] demonstrate the burden ‘(1) [was] in furtherance of a compelling governmental interest; and (2)[was] the least restrictive means of furthering that compelling governmental interest.’ ” Boerne,- *1437 U.S. at-, 117 S.Ct. at 2162, 138 L.Ed.2d at 636 (quoting 42 U.S.C. § 2000bb-l).

. Under the Equal Protection Clause, arbitrary state action can burden the rights of older individuals on the basis of age if the action passes the rational basis test, i.e., it is rationally related to a legitimate government interest. See Gregory, 501 U.S. at 470-71, 111 S.Ct. at 2405-06.

. At issue in Murgia was the constitutionality under the Equal Protection Clause of a state statute mandating a retirement age for state police officers. See 427 U.S. at 308, 96 S.Ct at 2563.

. The amendments to the FLSA that, among other things, extended that statute to federal, state and local government employees — and with which Congress passed the 1974 ADEA amendment-overshadowed the ADEA. The House and Senate considered the ADEA amendment to be "a logical extension of the Committee’s decision to extend FLSA coverage to Federal, State, and local government employees.” Elrod, 674 F.2d at 605 (internal quotation marks omitted). Even in light of this and the Supreme Court’s concluding that Congress passed the ADEA pursuant to its power under the Commerce Clause, my determination that Congress also was exercising its power under Section 5 of the Fourteenth Amendment in enacting the ADEA is not precluded. See Wyoming, 460 U.S. at 243, 103 S.Ct. at 1064 ("The extension of the ADEA to cover state and local governments, both on its face and as applied in this case, was a valid exercise of Congress’ powers under the Commerce Clause. We need not decide whether it could also be upheld as an exercise of Congress' powers under § 5 of the Fourteenth Amendment.”) (emphasis added); Hurd, 109 F.3d at 1546 (concluding, after Wyoming, that "Congress acted pursuant to its powers under the Fourteenth Amendment when it applied the ADEA to the states”); Ramirez, 715 F.2d at 700 (holding postWyoming that Congress adopted the 1974 ADEA amendment pursuant to its Section 5 power).

. In addition, included in the legislative history of the 1978 ADEA amendments is a statement from Representative Paul Findley further supporting the view that Congress’s legislation in the ADEA was part of its general policy to ensure equal employment opportunities. Representative Findley stated that "depriving older and still capable Americans of jobs [does not] make any more sense than discriminating in employment against blacks, women, or religious or ethnic minorities.” Elrod, 674 F.2d at 606 (quoting H.R.Rep. No. 95-527, Part I, 95th Cong., 1st Sess., reprinted in [1978] 753 Gov’t Empl. Rel. Rep. (BNA) 101, 103).

.The fact that employers can defend their age-based classifications on the grounds that such classifications are related to a "bona fide occupational qualification reasonably necessary to the normal operation of the particular business” or are "based on reasonable factors other than age,” supports the proposition that the ADEA only targets arbitrary age discrimination, rather than every employment decision that is based on or related to age. 29 U.S.C. § 623(f)(1) (1994). Even age-based employment distinctions under disparate impact claims generally do not violate the ADEA if the distinctions serve the "legitimate employment goals of the employer.” MacPherson v. University of Montevallo, 922 F.2d 766, 771 (11th Cir.1991) (quoting Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 659, 109 S.Ct. 2115, 2125, 104 L.Ed.2d 733 (1989)).

. Congress’s detailed findings in the ADA are one ground on which to distinguish the underlying Dickson case from Boerne, in which the Court noted that Congress made no findings concerning widespread unconstitutional discrimination against religious persons to support the RFRA. See Boerne, - U.S. at ---, 117 S.Ct. at 2169-70, 138 L.Ed.2d at 645-46; see also Coolbaugh, 136 F.3d at 438. The Court, however, went on to state that ''[iludida! deference, in most cases, is based not on the slate ol the legislative record Congress compiles but 'on due regard for the decision of the body constitutionally appointed to decide.' ” Boerne, - U.S. at -, 117 S.Ct. at 2170, 138 L.Ed.2d at 646 (quoting Oregon v. Mitchell, 400 U.S. 112, 207, 91 S.Ct. 260, 306, 27 L.Ed.2d 272 (1970) (Harlan, J.)).

. Although the Coolbaugh court was specifically referring to the ADA, I find the same to be true of the ÁDEA.